**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| _____ )<br>SDSE NETWORKS, INC.,      )<br>      )<br>    Plaintiff,     )<br>      )<br>    v.      )<br>      )<br>      )<br>SAROOP MATHUR,     )<br>      )<br>    Defendant.    )<br>_____ ) | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff SDSE Networks, Inc. ("SDSE"), for its Complaint against Defendant Saroop Mathur ("Mathur"), hereby alleges as follows:

**NATURE OF THE ACTION**

1.      SDSE brings this complaint against its former employee, Mathur, who deceived the company when he resigned and has since refused SDSE's repeated requests to return the company's computer equipment containing SDSE's confidential, proprietary, and trade secret information—including the source code for SDSE's proprietary communications technology, "SCOUT" (Secure Communications Over Untrusted Transport). The one piece of equipment Mathur did return to SDSE appears to have been wiped cleaned and locked by Mathur in breach of his contractual obligations to SDSE and in an apparent attempt to hide his improper conduct. Only Mathur knows the key to unlock the equipment, and he refuses to provide it. In short, Mathur's improper acts are an existential threat to SDSE and require immediate court action.

2. Mathur is not just simply refusing to return SDSE's equipment and trade secret information, he is do this while working for SDSE's former subsidiary, Eclipz.io, Inc. ("Eclipz")—a company that SDSE has ongoing litigation with relating to ownership of the SCOUT source code that Mathur misappropriated. As explained in more detail below, Eclipz was formed to further commercial adoption of SDSE's government-facing product, but control over Eclipz was subsequently wrestled away from SDSE's founders by Jeffrey Newman, the person the founders of SDSE hired and entrusted to raise capital for, and help them run, Eclipz.

3. It now appears that Mathur misled SDSE when he resigned, lulling SDSE into believing that Mathur remained interested in consulting with the company. Upon submitting his resignation, Mathur led SDSE to believe that he would be going to work for a cloud-computing security company, ZScaler, Inc. ("ZScaler"). He also agreed to continue to consult with SDSE and thus was permitted to keep his SDSE-issued computer equipment and the trade secret and other confidential and proprietary information on the equipment. However, SDSE recently learned that Mathur misled the company and had different plans when he left SDSE. Mathur had gone to work for Eclipz and took SDSE's equipment and trade secret and other confidential and proprietary information with him—all in violation of his agreements with SDSE.

4. SDSE asks this Court to enforce those agreements to avoid further irreparable harm to SDSE. For the reasons detailed below, the Court should order Mathur to return SDSE's property to the company and unlock the equipment, and prohibit Mathur from accessing, using, modifying, or disclosing SDSE's confidential and trade secret information; and the Court should enjoin Mathur from working for Eclipz during the pendency of this litigation.

## PARTIES

5.      Plaintiff SDSE is a Delaware corporation and has its principal place of business in Potomac Falls, Virginia.

6.      Defendant Saroop Mathur is a former employee of SDSE and, upon information and belief, is a resident of Los Altos Hills, California.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including 18 U.S.C. § 1836(c), and pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy between SDSE and Mathur exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction over the remaining claims asserted herein pursuant to 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as the federal claim.

8.      This Court has personal jurisdiction over Mathur because Mathur submitted to the exclusive personal jurisdiction of the federal and state courts of Virginia in connection with any dispute arising out of or related to his Employment Agreement (defined below).

## FACTUAL BACKGROUND

***Formation of SDSE***

9.      SDSE was formed on November 21, 2014, as a Delaware LLC. James Rautner, and Dennis Pollutro are the founders of SDSE. It is presently a Delaware corporation, with its principal place of business in Potomac Falls, Virginia.

10.     SDSE develops and provides highly-secure communications solutions for the U.S. Government worldwide. Specifically, through its proprietary technology, SCOUT (Secure Communications Over Untrusted Transport)—which was initially designed and developed to

support U.S. Government agency operations at home and abroad—SDSE provides secure, encrypted communication capability over any network, *e.g.*, Public Internet, Satellite, Private Network, WiFi, Mobile, and/or Mesh Networks.

11.     Given that SCOUT is used to encrypt communications between and among U.S. Government personnel, the source code and other intellectual property relating to SCOUT is especially sensitive and must remain confidential and secure; it is not disseminated outside of SDSE and subject to strict control measures intended to ensure that the information is protected from unauthorized access attempts and public disclosure.

12.     Since its inception, SDSE continued to improve, refine, develop, operate, support, and maintain its SCOUT technology through research and development supported by its U.S. Government client. Notwithstanding its government-related work, SDSE was and is authorized to deploy versions of its technology to customers in the public market, provided such deployment excludes sensitive and classified government-specific capabilities.

***SDSE Creates Eclipz to Further Commercial Adoption of Its Solution***

13.     On May 9, 2016, Rautner and Pollutro formed Eclipz.io, LLC as a wholly owned subsidiary of SDSE. The intention was to spin out SDSE's core technology to the commercial marketplace. This core technology was created and developed by SDSE for the U.S. Government with mixed funding from SDSE's own investments and the U.S. Government. The U.S. Government helped fund the development of SDSE's core technology prior to January 2019, including the core technology SDSE licenses to Eclipz, as discussed below. The U.S. Government continued to provide funding for the development of SDSE's technology, especially with respect to special features developed uniquely for the U.S. Government.

14.     Notwithstanding the foregoing, given that SDSE's technology was built specifically for the company's government client, and could not be deployed "as is" to commercial customers, SDSE needed to design a special build of its source code to isolate sensitive code features from any public facing software for deployment with commercial customers—all while keeping the existing core technology.

15.     Estimating that any process to deploy a commercial version of SDSE's core technology would require additional funding—albeit much less than would be required without SDSE's prior development work—Rautner and Pollutro set out to obtain funding for the newly-formed Eclipz.io, LLC entity.

16.     In January 2018, Rautner and Pollutro reached out to Jeffrey Newman, who Pollutro knew through earlier business activities, about joining Eclipz.io, LLC. Newman agreed to join Eclipz with the understanding that his role would be to lead investment capital fund raising, and to provide assistance in identifying a key brand or brands that would be Eclipz's first commercial client.

17.     During the course of negotiations relating to Newman joining Eclipz, Newman suggested that a C-Corp structure was necessary to attract outside investors. Based on his recommendation, Eclipz.io, LLC was converted to a C-Corp. Pollutro and Rautner agreed to make Newman a one-third owner in Eclipz, with ownership equally divided among Rautner, Newman, and Pollutro. These three individuals formed the initial Eclipz corporate Board of Directors and its corporate officers (Newman as Chief Executive Officer (CEO), Rautner as Chief Operating Officer (COO) and Chief Financial Officer (CFO), and Pollutro as Chief Technology Officer (CTO)). Eclipz.io, Inc. was incorporated on March 7, 2018.

*The License and Consulting Agreements*

18.     To facilitate Eclipz's entry into the commercial market, SDSE and Eclipz entered into two primary agreements: (1) an Exclusive Software License Agreement, by and between SDSE and Eclipz, effective as of March 29, 2018 (the "License Agreement"), and (2) a Consulting Agreement dated as of December 11, 2018 (the "Consulting Agreement"). The License Agreement allowed Eclipz to use and sell the SDSE software to end users. Under the Consulting Agreement, Eclipz would pay SDSE to provide support services through statements of work ("SOWs") or task orders.

19.     Under the License Agreement, SDSE granted Eclipz an exclusive, revocable license to (a) use, copy and create derivative works of SDSE's Software (as such term is defined in the License Agreement) and (b) to distribute the Software or any derivative works thereof, in object code form only, in the commercial market. SDSE retained U.S. Government, NATO, and international military use of its technology (including its sensitive code features) under the License Agreement.

20.     The License Agreement only granted Eclipz exclusive rights to deploy the technology in its reserved field, *i.e.*, in the commercial market. Further, the License Agreement did not convey any ownership of SDSE's "Intellectual Property Rights" (a defined term), which the License Agreement confirms remained with SDSE.

21.     Although the License Agreement was limited to a twelve-month renewable term, Newman insisted that the License Agreement be amended so that the license grant would become irrevocable and non-terminable. Newman represented that this change was necessary because the Series A lead investor for Eclipz requested the amendment as a condition to investing in Eclipz. Pollutro and Rautner, who placed their trust in Newman's good faith, agreed on behalf of SDSE

6

and the License Agreement was amended on June 21, 2019, to make the license irrevocable and non-terminable.

22.     Throughout 2018, SDSE continued to refine and build its technology under U.S. Government contracts, providing an increasingly complete technology foundation and sophisticated capability for Eclipz to leverage through its license when it identified its first potential customer. This first potential customer requested that a proof-of-concept ("POC") be created to demonstrate the capability of SDSE's technology to provide significantly enhanced security and protection. Eclipz did not have the ability to create the POC.

23.     Based on the foregoing, on December 11, 2018, Eclipz entered into the Consulting Agreement with SDSE to provide engineering support for the POC demonstration, commercialization engineering, and other commercialization and infrastructure support tasks.

24.     Services under the Consulting Agreement were to be provided by SDSE exclusively on the terms of agreed-upon SOWs. SDSE entered into six separate SOWs with Eclipz under the Consulting Agreement; performed in accordance with the terms of all such SOWs; and during the course of such performance, provided Eclipz with all "Deliverables" pursuant to the terms of each SOW and related task orders.

25.     Neither the License Agreement nor Consulting Agreement grant Eclipz any right or title to SDSE's source code.

### The California Proceeding

26.     In or about mid-2020, Newman raised the potential need for a merger of SDSE and Eclipz. He stated that a merger would be necessary at some point to secure additional funding for Eclipz, which had no paying customers or other revenue stream from its business.

27.     Eclipz and SDSE exchanged various drafts of proposed term sheets for a potential merger of the two companies in mid-2021, but those negotiations ultimately foundered in September 2021. Rautner and Pollutro rejected Eclipz's proposals because they did not agree on the value or compensation being offered for SDSE's business.

28.     Promptly after the merger discussions broke down, Eclipz, through Newman—for the first time—demanded the immediate turnover of SDSE's source code and underlying technology that was being licensed to Eclipz. SDSE rejected Eclipz's demands for the transfer and ownership of SDSE's source code.

29.     When Eclipz maintained its demands, Rautner and Pollutro resigned their positions as officers of Eclipz and their seats on the Board of Directors of Eclipz to avoid any appearance of a conflict of interest in responding to Eclipz's demands.

30.     Eclipz then expanded its demands to include not only immediate delivery of SDSE's source code but also the delivery of broad swaths of SDSE's proprietary technology, because they were allegedly "Deliverables" under the Consulting Agreement. Yet, Eclipz has never identified a single SOW or task order that required such a transfer of specific technology that was not already delivered by SDSE.

31.     Following SDSE's refusal to turn over its proprietary source code, Eclipz commenced litigation against SDSE in the Superior Court of the State of California, County of San Mateo, Case No. 21-CIV-06207, on November 18, 2021 (the "California Proceeding"), falsely claiming, among other things: (i) that SDSE has never provided Eclipz with a copy of the Software that it licenses from SDSE and (ii) that Eclipz has ownership rights to SDSE's source code for the Software (and other underlying technology) pursuant to the terms of the Consulting Agreement.

32.     Prior to Eclipz initiating the California Proceeding, on November 2, 2021, SDSE distributed a litigation hold to certain SDSE personnel—including Mathur—instructing them to retain all information that was potentially relevant to the dispute between SDSE and Eclipz (the "Litigation Hold").

33.     Eclipz's litigation against SDSE is not a legitimate legal claim, but, rather, a power grab that was commenced by current management, led by Newman with the assistance of Eclipz's two other directors that are loyal to him—Lani Ingram and Ryan Mass. SDSE, Pollutro, and Rautner have now not only filed their Answer in the California Proceeding, but filed a detailed First Amended Cross-Complaint (the "Cross-Complaint"), which outlines the history of the dispute; the parties' business dealings, including the discussions surrounding Eclipz's failed efforts to force a merger; SDSE's performance under the terms of the License Agreement and SOWs under the Consulting Agreement; and seeks, among other things, damages against Eclipz for breach of contract, and to rescind the gratuitous perpetual licenses that were granted to Eclipz for fraud in the inducement of the same. A true and correct copy of the Cross-Complaint is attached hereto as Exhibit 1.

**Dilution and the Delaware Books and Records Action**

34.     The efforts to seize SDSE's technology through the California Proceeding go hand-in-hand with Eclipz's efforts—orchestrated by Newman—to drive Pollutro and Rautner out of Eclipz.

35.     Upon information and belief, beginning in or around early 2022, Eclipz undertook efforts to dilute Pollutro and Rautner without their consent, knowledge, or participation.

36.     Eclipz has acted to keep Pollutro and Rautner in the dark on these endeavors. First, Eclipz refused Pollutro and Rautner's November 18, 2021, demand to call a meeting of Eclipz

stockholders to address the management of Eclipz, re-constitution of its Board, and the provision to its stockholders of information relating to the company's activities. Then, Pollutro and Rautner made a demand on June 28, 2022, to inspect Eclipz's books and records necessary to determine the true effect of Eclipz's recent transactions on their individual holdings under 8 Del. C. § 220 ("Section 220"). Eclipz refused to produce all of the records requested for nearly two months. Eclipz's obstruction compelled Pollutro and Rautner to initiate an action on August 16, 2022, under Section 220 in the Delaware Court of Chancery, Case No. 2022-0724, which is currently pending.

37.     Eclipz's actions described above set the stage for the existential threat to SDSE that Mathur has created.

***Mathur Joins SDSE***

38.     Mathur joined SDSE as its Senior Principal Engineer in August 2017. In this role, Mathur acted as one of SDSE's key senior software engineers, and was responsible for two major areas of the SCOUT platform: (1) modifying certain Xpressent VPN (virtual private network) code[1] that is a critical component of SDSE's software and (2) leading development of SDSE's micro-services (the software components that comprise SDSE's cloud-based management platform). On a day-to-day basis, Mathur was responsible for developing new code functionality, debugging and fixing errors, and maintaining micro-services code components.

39.     On at least one occasion, Mathur traveled to Virginia in connection with his employment by SDSE. Mathur attended as a representative of SDSE's engineering team an in-person meeting in Virginia on January 8, 2020, between SDSE and Eclipz personnel and a

---

[1]      Xpressent is a codebase that belongs to Mathur, which he has licensed to SDSE and Eclipz.

candidate for the role of Eclipz's Vice President of Engineering that was held to discuss, among other things, the potential of SDSE's technological solutions.

40.     During the course of Mathur's employment, SDSE provided Mathur with certain equipment. Among other things, SDSE provided Mathur with a MacBook Pro Model A2141 laptop (Serial No. C02FN06CMD6W) (the "MacBook"), a Dell Precision 5510 laptop (Serial No. 42299329430) (the "Dell"), and a WD 6TB Elements Desktop Hard Drive (the "Hard Drive") (together, the "Equipment"). The Equipment was provided to Mathur for the sole purpose of carrying out his responsibilities as Senior Principal Engineer. The Equipment is—and has been for all relevant periods—the property of SDSE.

41.     Local copies of the source code for SDSE's SCOUT and Eclipz software distributions (the "Source Code") was stored on each of the MacBook, Dell, and Hard Drive.

42.     As mentioned above, the Source Code is closely guarded. Other than for testing by the U.S. Government—conducted under very controlled "classified" conditions by MITRE Corporation—it is not let outside of SDSE. Only SDSE engineering employees and contractors whose job responsibilities necessitate have access, and all of whom are subject to non-disclosure agreements that prohibit disclosure of the Source Code.

43.     The Source Code is stored on SDSE's secure Git Repository. This repository itself is tightly controlled, with access by SDSE engineers locked down to only "whitelisted" IP addresses—meaning SDSE identifies the IP address each engineer is using to access the Internet, and allows access to the repository only to those specific IP addresses. Any IP that is not whitelisted cannot access the repository.

44. As just one salient data point of the tight controls applicable to the Source Code, Rautner, an SDSE co-founder and lead for a number of engineering tasks, does not even have access to it.

45. The Equipment also contained other trade secret, confidential, and proprietary SDSE information. Upon information and belief, this included (i) the system architecture of the SCOUT/Eclipz platform, including the management platform and endpoint client; (ii) the system design of the SCOUT/Eclipz platform, including the management platform and endpoint clients for multiple operating systems; (iii) the source code for all aspects of SDSE's management platform and client agent software; (iv) SDSE's DevOps processes and methods, including methods for code testing, code check-in, code labeling and versioning, software build process, and SDSE's unique platform deployment and configuration processes, methods, and related DevOps code; and (v) expertise, knowledge, and source code access for U.S. Government-specific sensitive functionality not made available to commercial or Government agencies outside of the Department of Defense and Intelligence Communities.

46. Like the Source Code, this information is closely guarded—being stored on secure systems and only made available to SDSE personnel subject to non-disclosure agreements. Mathur was one of the SDSE employees with access to this information.

**Mathur's Agreements with SDSE**

47. Mathur's employment was memorialized in an August 28, 2017, letter agreement (the "Employment Agreement"). The Employment Agreement is governed by Virginia law, and provides for exclusive jurisdiction in the federal and state courts located in Virginia for any claim arising out of or related to the Employment Agreement. A true and correct copy of the Employment Agreement is attached hereto as Exhibit 2.

48.     Also on August 28, in connection with the Employment Agreement, Mathur signed a Standard Proprietary Information and Inventions Agreement (the "SPII Agreement"). The SPII Agreement is governed by Virginia law, and provides for exclusive jurisdiction in the federal and state courts located in Loudoun County, Virginia for any claim related to the SPII Agreement. A true and correct copy of the SPII Agreement is attached hereto as Exhibit 3.

49.     In Section 3 of the SPII Agreement, Mathur agreed:

> that all Assigned Inventions and all other financial, business, legal and technical information, including the identity of and any other information relating to SDSE's employees, Affiliates and Business Partners . . ., which I develop, learn or obtain during my employment or that are received by or for SDSE in confidence, constitute "Proprietary Information" I will hold in strict confidence and not directly or indirectly disclose or, except within the scope of my employment, use any Proprietary Information. . . . Upon termination of my employment, I will promptly return to SDSE all items containing or embodying Proprietary Information (including all copies)[.]

50.     In Section 6 of the SPII Agreement, Mathur expressly agreed that his "obligations under Sections 2, 3, and 4 . . . shall continue in effect after termination of [his] employment[.]"

51.     Both the Employment Agreement and SPII Agreement became effective on August 31, 2017.

52.     On September 9, 2017, Mathur executed a Mutual Confidentiality Agreement with SDSE (the "Confidentiality Agreement," and together with the Employment Agreement and SPII Agreement, the "Agreements"). The Confidentiality Agreement is governed by Virginia law. A true and correct copy of the Confidentiality Agreement is attached hereto as Exhibit 4.

53.     The Confidentiality Agreement protects SDSE's "Information"—broadly defined in Section 1 of the agreement as:

> any and all information, data, lists, compilations, specifications, plans, engineering documents, files, file layouts, documentation, manuals, reports, software (source code and/or object code and/or binary code) and other materials provided to or obtained by [Mathur] by or from [SDSE] . . . "Information" specifically includes, but is not limited to . . . [SDSE's] technology, know how, trade secrets, trade,

proprietary and/or other confidential information . . . [and] information related to SDSE's SCOUT and SDSE products, including product architecture, design and engineering documents, software (source code and/or object code and/or binary code), and information describing how the SDSE technology functions and how such functionality is unique in the market[.]

54.     Under Section 3 of the Confidentiality Agreement, Mathur agreed:

that [SDSE's] Information is confidential and proprietary property of [SDSE] and constitutes a valuable trade secret of [SDSE]. . . [Mathur] agrees to use reasonable efforts to maintain, protect and assure the confidentiality thereof. Except as expressly provided above, [Mathur], whether by act or omission, shall not copy, publish, disseminate, divulge, release, furnish or otherwise disclose [SDSE's] Information to any other person or entity for any purpose whatsoever. . . . [Mathur] shall give [SDSE] immediate notice of any unauthorized use or disclosure of [SDSE's] Information. No Information provided to [Mathur] on [SDSE's] premises shall be removed therefrom without [SDSE's] express written consent. All of [SDSE's] Information shall be returned to [SDSE] on request[.]

55.     Section 4 of the Confidentiality Agreement provides that:

[u]pon the occurrence or the threatened or likely occurrence of any breach hereof, [SDSE] shall be entitled to: (a) temporary, preliminary and permanent equitable and injunctive relief, it being expressly stipulated that any unauthorized disclosure shall cause irreparable harm to [SDSE] and that [SDSE] shall not in such event have an adequate remedy at law; and (b) recover any and all losses, costs, expenses (including reasonable attorneys' fees) and damages which are determined by a court of competent jurisdiction to have been sustained by [SDSE].

56.     Per Section 8, the Confidentiality Agreement terminated two years after it was executed (September 9, 2019). However, Mathur's obligations survive the termination for five years thereafter (September 9, 2024). *See* Exhibit 4 at § 8.

***Mathur Departs SDSE for Eclipz, Taking SDSE's Data with Him***

57.     Mathur submitted his resignation to SDSE on December 6, 2021 (the "Resignation Letter")—just eighteen days after Eclipz initiated the California Proceeding. In the Resignation Letter, Mathur provided eleven days' notice. Mathur soon after informed SDSE that he had accepted a position with ZScaler—a cloud security company that does not compete with SDSE. A true and correct copy of the Resignation Letter is attached hereto as Exhibit 5.

14

58.    Following the submission of the Resignation Letter, SDSE and Mathur discussed entering into a relationship whereby Mathur would provide services to SDSE as an outside consultant. Given the intended relationship, together with Mathur's ongoing commitments and obligations under the Agreements, SDSE permitted Mathur to retain the Equipment after his resignation became effective. As of the date of Mathur's resignation, the Equipment contained up-to-date versions of the Source Code and other SDSE confidential, proprietary, and trade secret information. However, following the termination of the employment relationship, Mathur's access to the repository and other SDSE systems was disabled.

59.    SDSE ultimately did not have any work that necessitated Mathur's involvement as a consultant, and SDSE requested Mathur return the Equipment on June 24, 2022. A true and correct copy of this June 24, 2022, e-mail to Mathur is attached hereto as Exhibit 6.

60.    Mathur returned the MacBook to SDSE on July 6, 2022.

61.    SDSE received the MacBook in "hibernate" mode (*i.e.*, the laptop is put to sleep, with the RAM powered on, which allows the laptop to wake up when opened and go back to work quickly). When an SDSE engineer opened the MacBook after connecting a power cord, the MacBook's desktop was displayed, with the "Keychain Access" application open.

62.    The Keychain Access application is a Mac Operating System program that stores a computer's "keys" (*i.e.*, passwords) and other account information.

63.    The Keychain Access application on the MacBook should have contained the MacBook's encryption keys—but the engineer found that it contained no content at all. Such indicates that Mathur deleted all of the system's keys before the MacBook was returned.

64.    The SDSE engineer also found a "shell" program open on the MacBook's desktop. A shell program provides text-based access to a computer's operating system and files. The open

shell program on the MacBook revealed that Mathur was obtaining lists of the MacBook's file directories in an attempt to check their content.

65.     Further, the engineer found that there appeared to be no data at all on the MacBook for the user account logged in when the MacBook was put into "hibernate" mode—indicating that Mathur had deleted it. The engineer found the MacBook's operating system to be relatively intact, but crippled.

66.     The engineer later opened the MacBook a second time—without having shut it down or "rebooting" it—and the MacBook failed to load to the desktop. Rather, it prompted the engineer for credentials. When the engineer applied what SDSE understood to be the correct credentials, the MacBook failed to complete the login process.

67.     Upon information and belief, this scenario is likely the result of one of the following: (a) Mathur altered the MacBook's credentials, preventing SDSE from logging in, or (b) in deleting data on the MacBook, Mathur removed information required by the MacBook login process. Neither is permissible.

68.     Upon information and belief, the MacBook can now only be recovered by re-installing the operating system.

69.     Mathur's supposed employment with ZScaler had been a deception. Mathur had instead left to work for Eclipz.

70.     Upon information and belief, Mathur's representation to SDSE that he had accepted a position at ZScaler was false when made. And because of his agreement to continue to consult for SDSE and ongoing confidentiality obligations, SDSE allowed Mathur to retain the Equipment following his resignation. If SDSE had been made aware at the time of Mathur's resignation that

he would be working for Eclipz, he would not have been permitted to retain the Equipment or work for Eclipz.

71.     Having learned of Mathur going to work for Eclipz and understanding what he had done to the MacBook, SDSE served Mathur with a third-party subpoena in connection with the California Proceeding on or around August 10, 2022 (the "Subpoena"). The Subpoena sought, among other things, documents and communications relating to the destruction of data on the MacBook, any disclosure of SDSE's confidential or proprietary information, and Mathur's relationship with Eclipz. A true and correct copy of the Subpoena is attached hereto as Exhibit 7.

72.     Mathur, represented by Eclipz's counsel in the California Proceeding, responded to the Subpoena on August 31, 2022 (the "Subpoena Response"). Mathur objected to each request on relevance grounds and refused to provide a single document. A true and correct copy of the Subpoena Response is attached hereto as Exhibit 8.

73.     SDSE also notified Mathur, on August 18, 2022, of his obligations under the SPII Agreement, Confidentiality Agreement, and Litigation Hold, and demanded that he immediately cease and desist his breaches of his obligations. SDSE sent a supplemental notice on August 31, 2022, demanding Mathur immediately return the Dell and Hard Drive—and informing Mathur that if such Equipment was not returned by September 7, 202, SDSE would pursue legal action. True and correct copies of the August 18 and 31 letters are attached hereto as Exhibits 9 and 10, respectively.

74.     Mathur did not provide any response to either the August 18 or August 31 letters.

75.     Mathur has refused all requests to provide SDSE with the encryption keys to access the MacBook—or any details regarding the destruction of data thereon—or return the other Equipment in his possession. Accordingly, SDSE cannot determine with certainty what Mathur

has done with its data—including the Source Code—or to whom Mathur has disclosed it. Based on the facts and circumstances known to SDSE, Mathur wrongfully acquired SDSE's trade secrets and other confidential and proprietary information of SDSE. He also intentionally spoliated evidence on the MacBook and refuses to return SDSE's Dell and Hard Drive, which contain SDSE's trade secrets and other confidential and proprietary information. Based on this conduct, SDSE reasonably believes that Mathur has already provided, or is a real threat to provide, the Source Code and other SDSE confidential, proprietary, and trade secret information, to Eclipz.

**<u>COUNT I</u>**
**Misappropriation of Trade Secrets**
**(Defend Trade Secrets Act – 18 U.S.C. § 1831 *et seq.*, Virginia Uniform Trade Secrets Act – Va. Code § 59.1-336 *et seq.*, and California Uniform Trade Secrets Act – Cal. Civ. Code § 3426 *et seq.*)**

76.     SDSE restates and incorporates by reference each of the allegations set forth in paragraphs 1-75 above as if fully set forth herein.

77.     SDSE is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce. Such trade secrets comprise SDSE's financial, business, scientific, technical, economic, and engineering information, including but not limited to, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, and codes, both tangible and intangible and stored, compiled, and memorialized physically, electronically, and graphically.

78.     These trade secrets include, among other things, (i) the Source Code; (ii) the system architecture of the SCOUT/Eclipz platform, including the management platform and endpoint client; (iii) the system design of the SCOUT/Eclipz platform, including the management platform and endpoint clients for multiple operating systems; (iv) the source code for all aspects of SDSE's management platform and client agent software; (v) SDSE's DevOps processes and methods, including methods for code testing, code check-in, code labeling and versioning, software build

18

process, and SDSE's unique platform deployment and configuration processes, methods, and related DevOps code; and (vi) expertise, knowledge, and source code access for U.S. Government-specific sensitive functionality not made available to commercial or Government agencies outside of the Department of Defense and Intelligence Communities (the "Trade Secrets").

79.     The Trade Secrets are not the subject of public knowledge and not known to those in the field. Nor are the Trade Secrets readily ascertainable by others in the field.

80.     SDSE has taken reasonable measures to maintain the secrecy of the Trade Secrets as described above.

81.     The Trade Secrets derive independent economic value from not being generally known, as demonstrated by, among other things, SDSE's business contracting with the U.S. Government.

82.     The Trade Secrets implicate interstate and foreign commerce through, among other things, SDSE's business with the U.S. Government.

83.     Mathur acquired the Trade Secrets by virtue of his employment with SDSE and subject to the terms of the SPII Agreement and Confidentiality Agreement.

84.     Mathur acquired, disclosed and/or used the Trade Secrets without SDSE's express or implied consent. Mathur has used improper means to acquire, disclose, and/or use the Trade Secrets by failing to abide by the SPII Agreement and Confidentiality Agreement, including retaining the Trade Secrets under the false pretenses described above and, upon information and belief, using or disclosing the Trade Secrets in his work for Eclipz.

85.     Mathur's misappropriation of the Trade Secrets is in violation of the Defend Trade Secrets Act, Virginia Uniform Trade Secrets Act, and California Uniform Trade Secrets Act.

86.     Mathur's misappropriation of the Trade Secrets has caused SDSE to suffer irreparable harm and financial loses, in an amount to be proven at trial, and such harm persists so long as Mathur refuses to return SDSE's vital property, trade secret information, and confidential material.

87.     Because of Mathur's conduct and deception, SDSE has the right to, and has an immediate need for, relief created by Mathur's actions to preserve its rights and protect its business and business relationships.

## COUNT II
### Breach of Contract (SPII Agreement)

88.     SDSE restates and incorporates by reference each of the allegations set forth in paragraphs 1-87 above as if fully set forth herein.

89.     The SPII Agreement constitutes a valid and enforceable written contract between SDSE and Mathur.

90.     SDSE has at all times performed all of its obligations under the SPII Agreement.

91.     As described above, Mathur has breached the contract through his refusal to return SDSE's vital property, trade secret information, and confidential material, and, upon information and belief, disclosing SDSE's information to Eclipz.

92.     As a direct and proximate result of Mathur's breaches of the SPII Agreement, SDSE suffered and continues to suffer irreparable harm and damages in an amount to be proven at trial.

93.     SDSE has the right to injunctive relief for Mathur's breaches of the SPII Agreement.

## COUNT III
### Breach of Contract (Confidentiality Agreement)

94.     SDSE restates and incorporates by reference each of the allegations set forth in paragraphs 1-93 above as if fully set forth herein.

95.     The Confidentiality Agreement constitutes a valid and enforceable written contract between SDSE and Mathur.

96.     SDSE has at all times performed all of its obligations under the Confidentiality Agreement.

97.     As described above, Mathur has breached the contract through his refusal to return SDSE's vital property, trade secret information, and confidential material, destroying information on the MacBook and, upon information and belief, using or disclosing SDSE's information in his work for Eclipz.

98.     As a direct and proximate result of Mathur's breaches of the Confidentiality Agreement, SDSE suffered and continues to suffer irreparable harm and damages in an amount to be proven at trial.

99.     SDSE has the right to injunctive relief for Mathur's breaches of the Confidentiality Agreement.

### PRAYER FOR RELIEF

WHEREFORE, SDSE respectfully prays for judgment in favor of SDSE and against Mathur as follows:

I.     Granting SDSE preliminary and permanent injunctive relief:

a.     compelling Mathur to provide to SDSE any and all encryption keys, passwords, and/or other information necessary for SDSE to fully access the Equipment;

b.     compelling Mathur to return to SDSE the Dell and Hard Drive;

21

c.  prohibiting Mathur from accessing, using, disclosing, modifying, or deleting SDSE's confidential, proprietary, and trade secret information in violation of the SPII Agreement and Confidentiality Agreement; and

d.  prohibiting Mathur from working for or on behalf of Eclipz.

II.   Granting SDSE damages of $5,000,000, or an amount to be determined at trial.

III.   Enhancing any actual damages for Mathur's willful misappropriation of SDSE's trade secrets.

IV.   Granting SDSE an award of all reasonable attorneys' fees and other costs and expenses incurred.

V.   Granting SDSE such other and further relief as the Court deems just and proper.

Dated: September 9, 2022                    Respectfully submitted,

                                           By:____/s/ *Jon M. Talotta*____
                                           Jon M. Talotta (VSB No. 44590)
                                           W. James Conlin, IV (VSB No. 92169)
                                           HOGAN LOVELLS US LLP
                                           8350 Broad Street, Seventeenth Floor
                                           Tysons, VA 22102
                                           Tel: 703-610-6100
                                           Fax: 703-610-6200
                                           jon.talotta@hoganlovells.com
                                           william.conlin@hoganlovells.com

                                           Christopher J. Cox (*pro hac vice forthcoming*)
                                           Joseph Spoerl (*pro hac vice forthcoming*)
                                           HOGAN LOVELLS US LLP
                                           4085 Campbell Avenue, Suite 100
                                           Menlo Park, California 94025
                                           Tel: 650-463-4000
                                           Fax: 650-463-4199
                                           chris.cox@hoganlovells.com
                                           joseph.spoerl@hoganlovells.com

                                           *Counsel for Plaintiff SDSE*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 9, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Due to the emergency nature of this action, a true and accurate copy of the foregoing is being served on the following via federal express (overnight) and electronic mail:

Mark D. Flanagan
Allison Que
Sarah E. Maciel
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100
Mark.Flanagan@wilmerhale.com
allison.que@wilmerhale.com
Sarah.Maciel@wilmerhale.com

Edward Williams
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone: (202) 663-6000
Ed.Williams@wilmerhale.com

*Attorneys for Defendant Saroop Mathur*

_____/s/ *Jon M. Talotta*_____
Jon M. Talotta